UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHRISTOPHER CRENSHAW, | : | |
| Administrator of the Estate of | : | |
| THOMAS CRENSHAW, Deceased | : | **CIVIL ACTION - LAW** |
| | : | |
| | : | **JURY TRIAL DEMANDED** |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA | : | **NO. 02-CV-4006** |
| Defendant | : | |

**PLAINTIFF'S PRETRIAL MEMORANDUM**

I.  **Concise Summary and Nature of the Case**

  A.  Liability

This case arises out of the negligent care and treatment rendered to Thomas Crenshaw, deceased, in the year 2001 by the physicians at the Philadelphia Veteran's Administration Medical Center ("PVAMC"). As far back as 1993, Mr. Crenshaw received treatment from the physicians at PVAMC for routine medical needs.

During the period of time encompassing the years 1993 through 2000, Mr. Crenshaw was noted to have a past medical history of longstanding hypertension. His family history was significant for having three (3) brothers who all died from complications related to coronary artery disease in their 50's. Mr. Crenshaw was also a known cigarette smoker for many years. Throughout the 1990's, Mr. Crenshaw's medical care was primarily focused on his elevated blood pressure.

On January 16, 2001, Mr. Crenshaw presented to the PVAMC where he was examined by his physician, John M. Murphy, M.D., an internist. Upon examining Mr. Crenshaw, Dr. Murphy

assessed that he was experiencing difficulty breathing. Mr. Crenshaw had also experienced dizziness over the course of the previous two (2) weeks that required him to sleep upright in bed. He was noted to have a new onset of atrial fibrillation and was admitted to the medical intensive care unit to rule out myocardial infarction versus hypertensive cardiomyopathy. Mr. Crenshaw was begun on a course of intravenous Heparin for anticoagulation as well as Lasix.

On January 17, 2001, Mr. Crenshaw underwent a echocardiogram which proved to be a "technically limited study," but was interpreted by Dr. Frederick Samaha to reveal a left ventricular ejection fraction of 55%.

Thereafter, on January 19, 2001, Mr. Crenshaw underwent a nuclear cardiac stress test. The stress test was interpreted by Dr. Esther Kim to reveal a moderate-sized perfusion defect in the apical-lateral wall that was primarily reversible, a moderate size perfusion defect in the distal anterior septal apical wall that appeared reversible at the margins and a left ventricular ejection fraction of 31%.

On January 23, 2001, Mr. Crenshaw underwent a cardiac catheterization by Dr. Robert Li. The preliminary report of the catheterization revealed diffuse triple vessel coronary artery disease. More specifically, Dr. Li determined, at least preliminarily, that Mr. Crenshaw had lesions in his Right Coronary Artery of 60-70% and 90%, his Left Circumflex Artery of 90% and 100%, his Ramus of 80-90% and diffuse disease of his Left Anterior Descending Artery ranging from 50-70%. In his final report, Dr. Li determined, that the aforementioned lesions actually measured as follows: Right Coronary Artery of 50-80%, his Left Circumflex Artery of 70-100%, his Ramus of 80-90% and diffuse disease of his Left Anterior Descending Artery ranging from 50-60%. As such, Mr. Crenshaw's condition was defined by his physicians as "moderate 3-vessel coronary artery disease."

Thereafter, on January 25, 2001, Mr. Crenshaw had a transesophogeal echocardiogram that was interpreted by Dr. Elizabeth Tarka to reveal various findings, including but not limited to a left ventricular ejection fraction of 45%.

In summary, Mr. Crenshaw's examinations and diagnostic testing during his January, 2001 admission to PVAMC were interpreted to reveal, among other findings, the following:

- Diffuse and Hemodynamically Significant Triple Vessel Coronary Artery Disease[1];
- Shortness of Breath/Dyspnea (Mr. Crenshaw's "anginal equivalent")[2];
- Abnormal Left Ventricular Ejection Fractions Ranging from 31-55%[3]; and,
- Reversible Areas of Cardiac Ischemia[4].

The decision was made to manage Mr. Crenshaw's coronary artery disease medically as opposed to referring him for surgical treatment by way of angioplasty or coronary artery bypass graft surgery. Indeed, no surgical consult was ever requested or recommended to Mr. Crenshaw during his January, 2001 admission to the PVAMC. On January 29, 2001, Mr. Crenshaw was discharged to home from the PVAMC on various medications designed to control his hypertension, atrial fibrillation and fluid retention. Mr. Crenshaw was further instructed to follow-up with his PVAMC cardiologist, Dr. Bruce Dunkman on March 2, 2001, more than one (1) month later.

---

[1] There is a dispute between the parties as to the actual interpretation of the cardiac catheterization film.

[2] There is a dispute between the parties as to whether Mr. Crenshaw's dyspnea/shortness of breath was his "anginal equivalent."

[3] There is a dispute between the parties as to the correct interpretation of Mr. Crenshaw's left ventricular ejection fraction.

[4] There is a dispute between the parties as to the areas and extent of Mr. Crenshaw's reversible ischemia.

At the time of his discharge on January 29, 2001, Mr. Crenshaw's physicians failed to appreciate the severity of his coronary artery disease. They misinterpreted his diagnostic tests, failed to give proper weight to such tests and further failed to appreciate the fact that Mr. Crenshaw's shortness of breath was his "anginal equivalent." It was determined that, "although the patient has diffuse three-vessel coronary artery disease . . . the patient would be medically managed." Had his diagnostic tests and clinical presentation been properly interpreted and fully appreciated by his treating physicians, it would have been apparent that Mr. Crenshaw was a classic candidate for life-saving coronary artery bypass surgery.

On February 7, 2001, Mr. Crenshaw presented to the PVAMC Emergency Department where he was admitted with complaints of shortness of breath and dyspnea on exertion "since his [discharge] 1/29/01 from PVAMC." He was examined by Dr. Emily Cheng and was believed to have been experiencing mild congestive heart failure. Despite his ongoing symptoms, Mr. Crenshaw was told to increase his Lasix and discharged the same day.

Twelve (12) days later, on February 19, 2001, Mr. Crenshaw presented yet again to the PVAMC Emergency Department with identical complaints that included dyspnea, shortness of breath, and hypertension. Mr. Crenshaw was admitted to the Medical Intensive Care Unit to the cardiology service. During the course of his admission, he was seen by Dr. Takakuwa, Dr. Dunkman as well as Dr. Samaha.

On February 20, 2001, Mr. Crenshaw was examined by Dr. Takakuwa who noted that he had diffuse triple vessel disease. It was also noted that medical therapy had been initiated and that coronary artery bypass surgery should be addressed as an option.

The following day, Mr. Crenshaw was examined by Dr. Samaha who determined that "there is no clear need for revascularization, <u>especially in the absence of any anginal symptoms</u>." (Emphasis added).

On February 22, 2001, Mr. Crenshaw was examined again by Dr. Takakuwa who noted that his blood pressure and heart rate were labile. Despite his ongoing symptoms, complaints of weakness, request to stay in the hospital and labile vital signs, Dr. Takakuwa determined that there was "no medical reason for him to be in hospital." Dr. Takakuwa suggested that Mr. Crenshaw was depressed and recommended that he go to the mental health clinic the following day. Mr. Crenshaw disagreed with the proposition that he was depressed.

The following day, February 23, 2001, with no beds having been available on the medical floor, Mr. Crenshaw was discharged to home.

Approximately one (1) week later, on March 2, 2001,, as per the instructions received at the time of discharge, Mr. Crenshaw returned to the PVAMC for a follow-up appointment with Dr. Dunkman. Dr. Dunkman noted a history of coronary artery disease and that medical management had been recommended. Dr. Dunkman further noted ongoing dyspnea, shortness of breath and, erroneously, that he "<u>has never had angina</u>." (Emphasis added). Mr. Crenshaw was then instructed to return to the clinic in one (1) month.

Thereafter, on March 13, 2001, Mr. Crenshaw was seen by Dr. Murphy, the internist. Dr. Murphy examined Mr. Crenshaw, noting that his blood pressure remained elevated. Dr. Murphy also ascertained that Mr. Crenshaw continued to have dyspnea on moderate exertion despite the fact that he had been taking his medications. Mr. Crenshaw was instructed to follow-up, as scheduled, with cardiology and to return to Dr. Murphy in four (4) months.

Throughout the month of March, 2001, Mr. Crenshaw presented as instructed to the anticoagulation clinic for management of his Coumadin regimen that had been prescribed for prophylaxis as a result of his atrial fibrillation. It is important to note that on every single visit, Mr. Crenshaw's physicians felt him to be compliant with his medications.

On March 26, 2001, the same day on which he had presented to the anticoagulation clinic for the last time, Mr. Crenshaw went to work at his job at Riverfront State Prison in Camden, New Jersey. After his shift, Mr. Crenshaw returned to his car planning to go home for the night. Very shortly after leaving the prison, Mr. Crenshaw was noticed by a patrolman from the prison to have pulled over at the side of the road and was having difficulty breathing. 9-1-1 was immediately called and Mr. Crenshaw was treated on the scene by paramedics and a mobile intensive care unit within a five minutes. He was determined to be in acute respiratory distress and quickly went into respiratory failure. Mr. Crenshaw was intubated and transported to Our Lady of Lourdes Medical Center. Mr. Crenshaw was determined to have pulseless electrical activity and was pronounced dead at 4:46 p.m. The cause of death was determined to be acute myocardial infarction and coronary artery disease.

Plaintiff is prepared to present the testimony of two (2) medical experts, Dr. Wiedermann, an interventional cardiologist, and Dr. McCullough, a cardiothoracic surgeon. Drs. Wiedermann and McCullough have opined that Mr. Crenshaw was a candidate for early coronary artery bypass grafting. Plaintiff's experts agree that Mr. Crenshaw's physicians failed to appreciate the significance of his diagnostic tests, the severity of his disease and the importance of his clinical presentation, particularly his ongoing shortness of breath which was his "anginal equivalent." They further opine that having failed medical management, Mr. Crenshaw exhibited an even greater

urgency for coronary artery bypass grafting. Finally, Plaintiff's experts agree that such surgery was not contraindicated and would have been life-saving in Mr. Crenshaw's case.

Had Mr. Crenshaw been treated pursuant to the guidelines set forth by the American Heart Association and within accepted medical standards of care, he would have been referred to a cardiac surgeon and undergone life-saving, coronary artery bypass graft surgery for treatment of his coronary artery disease. No such referral was ever requested by Mr. Crenshaw's physicians nor was the option of surgery ever addressed with Mr. Crenshaw. Moreover, the physicians responsible for Mr. Crenshaw's care throughout the first three (3) months of the year 2001 failed to appreciate the findings from his diagnostic tests. They also disregarded his ongoing symptoms which included shortness of breath, Mr. Crenshaw's anginal equivalent. Mr. Crenshaw required surgery for treatment of his coronary artery disease as early as January, 2001. His ongoing failure to respond to medical management despite having complied with his medical regimen provided even further basis upon which surgery should have been undertaken. Despite obvious and classic symptoms and numerous opportunities to save his life, Mr. Crenshaw's physicians negligently failed to consider and provide surgical treatment that would have saved his life.

    B.    <u>Damages</u>

Plaintiff was caused to withstand months of symptoms related to his coronary artery disease including but not limited to, shortness of breath, exertional dyspnea, edema and exercise intolerance. Ultimately, as a result of his physician's failure to recommend him for life-saving surgery, Mr. Crenshaw died prematurely and unnecessarily on March 26, 2001.

II.   **Plaintiff's Witness List**

1.   Christopher Crenshaw
    1701 Salem Road
    Apartment 1-6
    Burlington, NJ 08016

    Summary: Christopher Crenshaw will testify as to his relationship with his Father, Thomas Crenshaw. He will also testify consistent with his deposition testimony, regarding his perception of Mr. Crenshaw's medical condition as well as discussions they had regarding same.

2.   Joseph G. Wiedermann, M.D., F.A.C.C.[5]
    Hackensack University Medical Center
    20 Prospect Avenue, Ste. 503
    Hackensack, New Jersey 07601

    Summary: Dr. Wiedermann is Plaintiff's invasive/interventional cardiology expert. He is expected to testify consistent with his expert reports and deposition testimony. He will opine that the care and treatment rendered to Mr. Crenshaw fell below acceptable medical standards of care. He will testify that given Mr. Crenshaw's diagnostic testing and clinical presentation, he should have been referred for cardiac surgery. He will further testify that CABG surgery was not contraindicated and that such surgery would have been life-saving.

3.   Jock N. McCullough, M.D., F.A.C.S.
    27 Old Chestnut Ridge Road
    Montvale, New Jersey 07645

    Summary: Dr. McCullough is Plaintiff's cardiothoracic surgery expert. He is expected to testify consistent with his expert reports and deposition testimony. He will opine that the care and treatment rendered to Mr. Crenshaw fell below acceptable medical standards of care. He will testify that given Mr. Crenshaw's diagnostic testing and clinical presentation, he should have

---

[5]The C.V.'s of Plaintiff's Medical Experts are attached hereto as Exhibits A and B.

been referred for cardiac surgery. He will further testify that CABG surgery was not contraindicated and that such surgery would have been life-saving.

4.         Frederick Samaha, M.D.
            C/O Paul G. Shapiro, Esquire
            Assistant U.S. Attorney
            U.S. Department of Justice
            615 Chestnut Street, Suite 1250
            Philadelphia, PA 19106-4476

Summary: Dr. Samaha was at all material times the Chief of Cardiology. Dr. Samaha examined and treated Mr. Crenshaw and is expected to provide testimony consistent with his deposition testimony. He is expected to comment on Mr. Crenshaw's medical condition, his diagnosis and treatment of Mr. Crenshaw, his review of Mr. Crenshaw's medical records and Mr. Crenshaw's indications for surgical management of his coronary artery disease.

5.         Robert Li, M.D.
            C/O Paul G. Shapiro, Esquire
            Assistant U.S. Attorney
            U.S. Department of Justice
            615 Chestnut Street, Suite 1250
            Philadelphia, PA 19106-4476

Summary: Dr. Li was at all material times the invasive cardiologist who performed and interpreted the cardiac catheterization upon Thomas Crenshaw on January 23, 2001. Dr. Li examined and treated Mr. Crenshaw and is expected to provide testimony consistent with his deposition testimony. He is expected to comment on Mr. Crenshaw's medical condition, his diagnosis and treatment of Mr. Crenshaw, his review of Mr. Crenshaw's medical records and Mr. Crenshaw's indications for surgical management of his coronary artery disease.

6.         Elizabeth Tarka, M.D.
            C/O Paul G. Shapiro, Esquire
            Assistant U.S. Attorney

>U.S. Department of Justice
>615 Chestnut Street, Suite 1250
>Philadelphia, PA 19106-4476

Summary: Dr. Tarka was at all material times an attending cardiologist who cared for and treated Thomas Crenshaw in January, 2001. Dr. Tarka examined and treated Mr. Crenshaw and is expected to provide testimony consistent with her deposition testimony. She is expected to comment on Mr. Crenshaw's medical condition, her diagnosis and treatment of Mr. Crenshaw, her review of Mr. Crenshaw's medical records and Mr. Crenshaw's indications for surgical management of his coronary artery disease.

7. John Murphy, M.D.
   C/O Paul G. Shapiro, Esquire
   Assistant U.S. Attorney
   U.S. Department of Justice
   615 Chestnut Street, Suite 1250
   Philadelphia, PA 19106-4476

Summary: Dr. Murphy was at all material times an attending internist who cared for and treated Thomas Crenshaw in 2001. Dr. Murphy examined and treated Mr. Crenshaw and is expected to provide testimony on Mr. Crenshaw's medical condition, his diagnosis and treatment of Mr. Crenshaw, his review of Mr. Crenshaw's medical records and Mr. Crenshaw's indications for surgical management of his coronary artery disease.

8. Bruce Dunkman, M.D.
   C/O Paul G. Shapiro, Esquire
   Assistant U.S. Attorney
   U.S. Department of Justice
   615 Chestnut Street, Suite 1250
   Philadelphia, PA 19106-4476

Summary: Dr. Dunkman was at all material times an attending cardiologist who cared for and treated Thomas Crenshaw in 2001. Dr. Dunkman examined and treated Mr. Crenshaw and

is expected to provide testimony on Mr. Crenshaw's medical condition, his diagnosis and treatment of Mr. Crenshaw, his review of Mr. Crenshaw's medical records and Mr. Crenshaw's indications for surgical management of his coronary artery disease.

9. Amanda Benson, M.D.
C/O Paul G. Shapiro, Esquire
Assistant U.S. Attorney
U.S. Department of Justice
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106-4476

Summary: Dr. Benson was at all material times a cardiologist who cared for and treated Thomas Crenshaw in January, 2001. Dr. Benson examined and treated Mr. Crenshaw and is expected to provide testimony on Mr. Crenshaw's medical condition, her diagnosis and treatment of Mr. Crenshaw, her review of Mr. Crenshaw's medical records and Mr. Crenshaw's indications for surgical management of his coronary artery disease.

10. Caroline Milne, M.D.
C/O Paul G. Shapiro, Esquire
Assistant U.S. Attorney
U.S. Department of Justice
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106-4476

Summary: Dr. Milne was at all material times an attending cardiologist who cared for and treated Thomas Crenshaw in 2001. Dr. Milne examined and treated Mr. Crenshaw and is expected to provide testimony on Mr. Crenshaw's medical condition, her diagnosis and treatment of Mr. Crenshaw, her review of Mr. Crenshaw's medical records and Mr. Crenshaw's indications for surgical management of his coronary artery disease.

11. Kevin Takakuwa, M.D.
C/O Paul G. Shapiro, Esquire
Assistant U.S. Attorney

        U.S. Department of Justice
        615 Chestnut Street, Suite 1250
        Philadelphia, PA 19106-4476

<u>Summary</u>: Dr. Takakuwa was at all material times an attending cardiologist who cared for and treated Thomas Crenshaw in 2001. Dr. Takakuwa examined and treated Mr. Crenshaw and is expected to provide testimony on Mr. Crenshaw's medical condition, his diagnosis and treatment of Mr. Crenshaw, his review of Mr. Crenshaw's medical records and Mr. Crenshaw's indications for surgical management of his coronary artery disease.

12.     Emily H.T. Cheng, M.D.
        C/O Paul G. Shapiro, Esquire
        Assistant U.S. Attorney
        U.S. Department of Justice
        615 Chestnut Street, Suite 1250
        Philadelphia, PA 19106-4476

<u>Summary</u>: Dr. Cheng was at all material times a emergency room physician who cared for and treated Thomas Crenshaw in February, 2001. Dr. Cheng examined and treated Mr. Crenshaw and is expected to provide testimony on Mr. Crenshaw's medical condition, her diagnosis and treatment of Mr. Crenshaw, her review of Mr. Crenshaw's medical records and Mr. Crenshaw's indications for surgical management of his coronary artery disease.

Plaintiff reserves the right to supplement his Witness List.

III. **Plaintiff's Exhibit List**[6]

    P-1.    Detailed Chronology of Events Chart

    P-2.    Still "frozen" image(s) from 1/23/01 Cardiac Catheterization Film

    P-3.    Exemplar Coronary Artery With/Without Plaque

    P-4.    8/18/03 Report of Defendant's Expert, Zoltan G. Turi, M.D.

    P-5.    C.V. of Zoltan G. Turi, M.D.

    P-6.    9/24/03 Report of Defendant's Expert, Luis I. Araujo, M.D.

    P-7.    C.V. of Luis I. Araujo, M.D.

Plaintiff reserves the right to supplement his Exhibit List.

IV. **Itemization of Injuries and Damages**[7]

| | |
|---|---|
| Past Pain and Suffering | $ |
| Past Loss of Life's Pleasures | $ |
| Past Embarrassment and Humiliation | $ |
| Wrongful Death | $ |
| Survival | $ |

V. **Settlement Negotiations**

Defendant has never tendered an offer to settle in this matter. The parties have long-agreed that the case at bar will not resolve by way of settlement and will require a trial on all issues.

---

[6] It should be noted that the parties are submitting a comprehensive, previously agreed-upon Joint Exhibit List.

[7] It should be noted that Plaintiff is not making a claim for medical expenses or wage loss.

13

VI. **Stipulations of Counsel**

_____ To be submitted with defendant's Pretrial Memorandum

VII. **Anticipated Legal Issues**

The parties have agreed that there will be no Motions for Summary Judgment or <u>Daubert</u> Motions filed. The only anticipated legal issues at this time may be to the admissibility of certain Exhibits and Things that are not incorporated in the parties Joint Exhibit List which is to be submitted with defendant's Pretrial Memorandum.

VIII. **Length of Trial**

Plaintiff expects the presentation of evidence to take approximately two (2) trial days.

                                         Respectfully submitted,

                                         JARVE & KAPLAN, LLC


                      By: _____
                           Adam M. Starr, Esquire

Dated:       November 14, 2003