IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHRISTOPHER CRENSHAW, | : | CIVIL ACTION |
| Administrator of the Estate of | : | |
| THOMAS CRENSHAW | : | |
| | : | No. 02-CV-4006 |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA | : | |

   **AND NOW**, this 10th day of March, 2004, after a non-jury trial at which the Court had the opportunity to observe the demeanor of the witnesses and to evaluate their testimony, and after considering the conflicting expert testimony, the Court makes the following findings of fact and conclusions of law.

## **FINDINGS OF FACT**

  1. Thomas Crenshaw ("Crenshaw"), a United States Army veteran, was a patient of the Philadelphia Veterans Administration Medical Center ("Medical Center") from October, 1993, until March 26, 2001, the date of his death.

  2. During the time he was a patient of the Medical Center, Crenshaw was diagnosed and treated for a number of conditions, including hypertension for which medication was prescribed.

  3. In May, 1999, Dr. John Murphy ("Murphy") became Crenshaw's primary care physician at the Medical Center.

  4. On July 18, 2000, Murphy prescribed medication for the treatment of Crenshaw's high blood pressure.

5. On January 16, 2001, Crenshaw presented at the Medical Center with complaints of shortness of breath and leg edema which had been present during the previous five days. He denied having any chest pain.

6. Murphy admitted Crenshaw to the Medical Center with a preliminary diagnosis of atrial fibrillation, congestive heart failure related to the atrial fibrillation, rule out myocardial infarction, hypertension and possible hypertensive cardiomyopathy.

7. He was admitted primarily for treatment of the atrial fibrillation.

8. On January 17, 2001, Crenshaw underwent a transthoracic echocardiogram ("TTE") which was interpreted by Dr. Frederick Samaha ("Samaha"), Chief of the Cardiovascular Division at the Medical Center.

9. The TTE revealed that the ejection fraction, the amount of blood expelled by the heart, was within normal limits, and that there were no regional wall abnormalities.

10. Samaha opined that Crenshaw's symptoms were due to atrial fibrillation which caused the shortness of breath.

11. On January 19, 2001, a nuclear stress test was administered to determine whether the patient's heart was receiving adequate blood supply and whether there were any blockages inhibiting or preventing blood supply to essential parts of the heart.

12. Dr. Esther Kim ("Kim"), a staff radiologist at the Medical Center, reported that the stress test showed one fixed defect, one fixed defect with slight reversibility at the margins, and one moderate sized reversible defect.[1]

---

[1] A fixed defect indicates that the heart muscle is dead and cannot be repaired. Reversible defects, which are revealed by a normal blood supply at rest and an abnormal supply in stress, may be repairable by bypass surgery.

13. On January 23, 2001, Crenshaw underwent a cardiac catheterization which was performed and interpreted by Dr. Robert Li ("Li"), now an interventional cardiologist and a clinical cardiologist, who was Board certified in cardiovascular diseases and internal medicine.

14. In his final report, Li noted diffuse disease in Crenshaw's coronary arteries, specifically significant lesions, defined as in excess of 70% blockage, in minor vessels and distal portions of major vessels. He concluded that "The LAD is diffusely diseased with lesions of 50-60% in the proximal, mid, and distal vessel. There is a large ramus with 90% stenosis... Immediately after the OMI origin is a 70% LCX stenosis. The mid RCA and PDA origin have 50% stenosis. There is an 80% stenosis of the RCA in the AV groove."

15. Li determined that Crenshaw had a lesion in the proximal left anterior descending artery, a major vessel, of less than 50-60%.

16. Dr. Elizabeth Ann Tarka ("Tarka") became Crenshaw's attending cardiologist physician on January 22, 2001.

17. Reviewing Crenshaw's chart and test results, Tarka noted that the patient was suffering from shortness of breath, leg swelling, atrial fibrillation and long standing hypertension for the past thirty years. She observed that he was on medication to control his heart rate and he seemed to be doing well.

18. Tarka, concluding that the stress test demonstrated only minimal areas of reversibility, determined that coronary artery bypass graft ("CABG") surgery was inappropriate and not warranted in light of Crenshaw's moderate three vessel disease.

19. In Tarka's opinion, CABG surgery would not have improved Crenshaw's condition.

20. Tarka's opinion that CABG surgery was unnecessary was based upon her conclusion that Crenshaw's symptoms were not caused by coronary heart disease but by the new onset of the atrial fibrillation, the resultant congestive heart failure and the history of hypertension.

21. Tarka undertook to treat Crenshaw's atrial fibrillation. Her plan was to perform cardioversion to return his heart to normal sinus rhythm which would alleviate his symptoms.

22. During his inpatient stay at the Medical Center, Crenshaw's congestive heart failure had been treated and his blood pressure brought under control, leaving only the atrial fibrillation to be treated.

23. The physicians at the Medical Center treated and did not ignore Crenshaw's heart problems.

24. Before performing cardioversion, Tarka ordered a trans-esophageal echocardiogram ("TEE") to determine whether there was a blood clot in the left atrium and the left atrial appendage, the presence of which would raise a contraindication to cardioversion.

25. On January 25, 2001, Tarka supervised and interpreted the TEE test which revealed a thrombus, a blood clot, in Crenshaw's left atrial appendage.

26. In Tarka's opinion, there was a risk of the clot or thrombus dislodging during cardioversion, which could cause a stroke.

27. It was appropriate and reasonable to consider the presence of the blood clot or thrombosis a contraindication for CABG surgery.

28.  Tarka ordered an anticoagulation regimen for a period of four weeks, after which another TEE would be administered to see if the clot had disappeared and cardioversion could proceed.

29.  Tarka did not consult with an interventional cardiologist or discuss with Crenshaw the possibility of CABG surgery.

30.  Crenshaw remained an in-patient at the Medical Center until he was discharged on January 29, 2001, with a principal diagnosis of atrial fibrillation, and a secondary diagnosis of coronary artery disease and hypertension.

31.  When Crenshaw was discharged from the Medical Center on January 29, 2001, he was feeling exhilarated and was not complaining of any shortness of breath or chest pain.

32.  Upon Crenshaw's discharge from the Medical Center on January 16, 2001, the plan was to anticoagulate his blood until he could be readmitted for cardioversion.

33.  On February 7, 2001, Crenshaw presented to the Emergency Room of the Medical Center, complaining of shortness of breath on exertion and swollen legs since discharge.

34.  During the February 7, 2001, outpatient visit, Crenshaw was treated with Lasix and discharged with adjustment to his diuretic medication.

35.  Crenshaw returned to the Emergency Room on February 19, 2001, again complaining of shortness of breath and lower leg edema.

36.  He was admitted to the Medical Center where he was treated with diuretics until his discharge on February 23, 2001.

37.  On March 2, 2001, during a routine cardiology visit, Crenshaw's medications

were adjusted.

38.　On March 13, 2001, during a routine follow up visit with Murphy, Crenshaw reported that he was taking his medications, became short of breath on moderate exertion and did not have any chest pain or neurologic symptoms.

39.　On this visit, Murphy determined that the atrial fibrillation had stabilized and recommended additional medication to control Crenshaw's blood pressure, which recommendation Crenshaw rejected.

40.　On March 26, 2001, Crenshaw visited the coumadin clinic for continuing evaluation of his anticoagulation level.

41.　After leaving the coumadin clinic, Crenshaw reported to his job.

42.　After completing his work shift, Crenshaw drove from his employer's parking lot and was later found slumped over the wheel on the side of the road.

43.　Crenshaw later died at Our Lady of Lourdes Medical Center where he was noted to have ventricular tachycardia leading to ventricular fibrillation and ending in his death.

44.　Crenshaw's death certificate noted the cause of death as acute myocardial infarction secondary to coronary artery disease.

45.　No autopsy was performed.

46.　At no time while he was a patient of the Medical Center was CABG surgery discussed or offered to Crenshaw.

47.　Prior to his death, Crenshaw had been treated by physicians at the Medical Center in a manner within the acceptable standard of care, particularly within the standard of care for a cardiologist.

48. The physicians at the Medical Center did not deviate from acceptable standards of medical care while caring for and treating Crenshaw.

49. The Medical Center's treatment of Crenshaw for atrial fibrillation, a clot in the left atrium, coronary artery disease and hypertension was appropriate and within the acceptable standards of medical care.

50. Crenshaw's death was not caused by nor was the risk of death increased by anything the physicians at the Medical Center negligently did or failed to do.

## **CONCLUSIONS OF LAW**

1. Pursuant to the Federal Tort Claims Act, 28 U.S.C. §1346(b), Pennsylvania law controls because Crenshaw was treated in Pennsylvania where the alleged negligence occurred.

2. Professional negligence consists of a negligent, careless, or unskilled performance by a physician of the duties imposed on him or her by the professional relationship with the patient. It is also negligence when a physician shows a lack of proper care and skill in the performance of a professional act.

3. A physician who does not possess the same knowledge and skill, and does not use the same care normally used in the medical profession is negligent.

4. A physician who professes to be a specialist in a particular field of medicine must have the same knowledge and skill, and use the same care as other specialists in that same medical specialty. A specialist whose conduct does not meet this professional standard of care is negligent.

5. A physician is legally responsible or liable for the injuries suffered by his or

her patient if the defendant's negligent conduct is a cause of those injuries.

6. If death would have happened even if the physicians had not been negligent, then the negligent conduct of the physicians would not be a factual cause in causing the death.

7. When a physician negligently fails to act, or negligently delays in taking indicated diagnostic or therapeutic steps, and his or her negligence is a factual cause in causing the patient's death, the plaintiff does not have to prove to a certainty that proper care would have, as a medical fact, prevented the injuries in question.

8. A causal connection between the death and a defendant's failure to use reasonable care may be proved by evidence that the risk of incurring death was increased by the defendant's negligent conduct.

9. Where competent medical authority is divided, a physician will not be held responsible if, in using his or her judgment, the physician followed a course of treatment advocated by a considerable number of recognized and respected professionals in his or her given area of expertise.

10. In resolving the conflict in the testimony of the expert witnesses, the fact finder must consider the relative qualifications and reliability of the expert witnesses, the reasons for each opinion and the facts upon which it is based.

11. The physicians at the Medical Center used reasonable skill and care in diagnosing Crenshaw's condition and in treating him.

12. The Medical Center physicians possessed and exercised the skill and care consistent with and exercised by members of the medical profession and respective specialties.

13. Crenshaw's death was not legally or factually caused by any variance from acceptable medical practice.

_____
TIMOTHY J. SAVAGE, J.